UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JUSTIN LEE RUMLER, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:21-CV-203-MGG |
| LT. MYERS, et al., | |
| Defendants. | |

## OPINION AND ORDER

Justin Lee Rumler, a prisoner without a lawyer, proceeds in this case on Eighth Amendment claims against Lieutenant Myers, Sergeant Wells, and Sergeant Moore regarding the unsanitary conditions of his confinement. ECF 83. He alleges that these defendants ignored his complaints about the prior occupant's blood on the cell walls and left him in the unsanitary cell for fourteen hours on August 20, 2020. He further alleges that he contracted hepatitis C as a result of these unsanitary conditions. The defendants filed a motion for summary judgment, arguing that, even accepting Rumler's account as true, they did not act with deliberate indifference toward a substantial risk of harm. ECF 213. Rumler also filed a motion for leave to file a sur-reply (ECF 227), which the court grants.

## FACTS

The facts viewed in the light most favorable to Rumler are as follows. On August 19 and August 20, 2020, Rumler resided in the restrictive housing unit at the Miami Correctional Facility. ECF 222-1 at 1. Sergeant Wells worked from 5:45 a.m. to 6:00 p.m.

on August 20.[1] ECF 213-2 at 5. Lieutenant Myers worked from 6:00 a.m.to about 6:00 p.m. on August 19. ECF 213-4. On August 20, he arrived between 6:00 a.m. and 8:00 a.m. and remained until at least 4:00 p.m. *Id.* Sergeant Moore worked from 6:00 p.m. to 6:00 a.m. on August 19 and August 20. ECF 213-5.

At about 6:00 p.m., on August 19, 2020, correctional staff signaled a medical emergency because, in Cell 104, William Cox, another inmate who had been diagnosed with hepatitis C, had cut his neck, smeared blood on the windows and the cell door, and also left blood on the walls and floor.[2] ECF 222-1 at 89-90, 92. Lieutenant Myers oversaw the removal of Inmate Cox from the cell and called the biohazard team to clean the cell. ECF 213-4. Sergeant Moore saw Inmate Cox's removal from the cell and the bloody conditions. ECF 213-5. He also saw the biohazard team cleaning the cell.[3] *Id.* Lieutenant Myers ended his shift after resolving the situation with Inmate Cox. ECF 213-4.

At about 2:00 a.m., correctional staff moved Rumler to Cell 104, where Rumler observed that blood covered the cell door, including the windows and cuff port, the

---

[1] Though Sergeant Wells attests to working only on August 19 (ECF 213-3), she appears on the morning shift roster for August 20, and the defendants do not address this discrepancy. As a result, the court will construe the evidence in the light most favorable to Rumler, the non-moving party, and assume that Sergeant Wells worked on August 20.

[2] Though the precise amount of blood involved is unclear, Inmate Cox's affidavit, dated September 22, 2020, indicates that he survived this incident. ECF 222-1 at 92. According to the incident report, Inmate Cox was conscious when correctional staff found him and was able to explain why he had cut himself in a fair amount of detail without any apparent difficulty. *Id.* at 89-90.

[3] Rumler attempts to dispute this fact based on his personal observations of the cell hours later, which suggested that it had not been adequately cleaned. ECF 224 at 10. However, the court draws a distinction between Sergeant Moore's attestation that he observed some effort to clean the cell and Rumler's representations regarding the adequacy of that cleaning effort.

2

back window, the sink area, and parts of the floor. ECF 222-1 at 2. At about 5:00 a.m., he told a correctional officer about the cell conditions, and the correctional officer "told [Rumler] that he would let [Sergeant] Moore know about the situation before [he] finished [his] shift at 6:00 a.m." *Id.* At 7:30 a.m., Rumler reported and showed the cell conditions to Sergeant Wells as a nurse passed his medication through the cuff port. *Id.* at 3. Sergeant Wells responded that "she would notify Lieutenant Myers when he showed up for work and would go from there." *Id.* At about 9:30 a.m., Rumler asked a correctional officer to follow up with Sergeant Wells and Lieutenant Myers on whether he could move to another cell. *Id.* At about 10:30 a.m., the correctional officer returned and said that "he spoke with [Sergeant] Wells, and she stated that she could not do anything until a movement order was put into place" and "[Lieutenant] Myers had been notified." *Id.* at 4. At about noon, Lieutenant Myers came to Rumler's cell, and Rumler informed him on the cell conditions. *Id.* Lieutenant Myers responded that he knew of the cell conditions and "they were trying to figure something out." *Id.* at 4-5. At about 3:30 p.m., correctional staff removed Rumler from Cell 104, and he was assigned to a new cell shortly thereafter. *Id.* at 6. On October 6, 2020, Rumler transferred to another facility. *Id.* at 9.

On January 12, 2018, Rumler tested negative for hepatitis C. *Id.* However, on January 6, 2021, Rumler tested positive for hepatitis C. *Id.* Rumler has not received tattoos, failed drug screens, or been caught with drugs since his incarceration. *Id.* He has not had any other contact with blood since January 12, 2018. *Id.*

STANDARD OF REVIEW

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

DISCUSSION

The defendants argue that they are entitled to summary judgment because, even accepting Rumler's account as true, they did not act with deliberate indifference toward a substantial risk of harm. The Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted). In evaluating an Eighth Amendment claim, courts conduct both an objective and a subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the alleged deprivation is "sufficiently serious" that the action or inaction of a prison official leads

4

to "the denial of the minimal civilized measure of life's necessities." *Id*. (citations omitted).

On the subjective prong, the prisoner must show the defendant acted with deliberate indifference to the inmate's health or safety. *Farmer*, 511 U.S. at 834. *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quotation marks omitted). "Deliberate indifference . . . means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008). Deliberate indifference is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). To prevail, the plaintiff must establish that the defendant "had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago*, 599 F.3d at 756. "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to state an Eighth Amendment claim. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). "Exercising poor judgment . . . falls short of meeting the standard of consciously disregarding a known risk to his safety." *Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997). Instead, the inmate must allege "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021).

"[A] plaintiff must allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that that serious

5

harm might actually occur." *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). The Seventh Circuit has equated substantial risks to "risks so great that they are almost certain to materialize if nothing is done." *Id.* at 911.

To start, the court finds that the record contains insufficient evidence to reasonably infer that Sergeant Moore was aware that Rumler had been exposed bloody cell conditions on the morning of August 20. The undisputed evidence shows that, on the evening of August 19, Sergeant Moore reasonably believed that Cell 104 had been cleaned because he saw the biohazard team cleaning the cell. Further, while the court credits Rumler's representations as to his interactions with a correctional officer at 5:00 a.m. on August 20, there is no indication that correctional officer followed through with contacting Sergeant Moore before the end of the shift. Perhaps more significantly, even assuming that the correctional officer followed through, it is unclear what the correctional officer said to Sergeant Moore or how he said it. For example, if the correctional officer merely placed a note on Sergeant Moore's desk saying, "There is a problem with Cell 104," Sergeant Moore may not have noticed it until his next shift, and, even if he had noticed it earlier, it would not have apprised him of the risk of harm to Rumler.

The court also observes a disconnect between Rumler's allegations on what the defendants knew and the harm he suffered. Specifically, he alleges that the defendants knew of the bloody conditions of the cell, and he alleges that he contracted hepatitis C

6

as a result.[4] However, the record does not demonstrate that any defendants knew that Inmate Cox had hepatitis C or knew of the risk that Rumler would contract hepatitis C when Sergeant Wells and Lieutenant Myers left him in the cell for eight hours until they received the proper paperwork. Sergeant Wells and Lieutenant Myers likely knew of a generalized health risk associated with exposure to another individual's blood, but such a generalized health risk falls short of a substantial risk of harm. In other words, the defendants lacked sufficient information to know that contracting hepatitis was "almost certain to materialize if nothing was done." In sum, the record does not demonstrate Sergeant Wells and Lieutenant Myers were aware that Rumler faced a substantial risk of contracting hepatitis C or of suffering any other type of serious harm.

Nevertheless, even absent knowledge of more specific and more substantial risks such as the presence of hepatitis C, the Eighth Amendment would not allow correctional staff to place an inmate in a cell smeared with blood over a long period of time. This is because "[a] condition which might not ordinarily violate the Eighth Amendment may nonetheless do so if it persists over an extended period of time." *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997). While there are few cases within this circuit involving exposure to another person's blood, the cases discussing exposure to bodily waste seem appropriately analogous for purposes of an Eighth Amendment

---

[4] For purposes of this order, the court will assume that Rumler contracted hepatitis C from Cell 104. That said, Rumler offers no medical evidence to support that he contracted hepatitis C in this manner or on the general likelihood of contracting hepatitis C in this manner. *See* Fed. R. Evid. 701(c) ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is rationally based on the witness's perception not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").

7

analysis. The concerns associated with such exposure extends beyond health concerns and invoke general standards of dignity. *See DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (quoted with approval in *Hardeman v. Curran*, 933 F.3d 816, 821 (7th Cir. 2019)). That said, brief exposure to human waste does not violate the Eighth Amendment. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) ("A single clogged toilet does not violate the Constitution"); *Balistreri v. Kast*, 2017 WL 3299048, at *3 (W.D. Wis. Aug. 2, 2017) ("[A] brief exposure to human waste, without more, does not rise to the level of a constitutional concern.").

To determine when exposure to another person's blood amounts to a constitutional concern, the court has surveyed the following cases:

- In *Johnson v. Pelker*, 891 F.2d 136 (7th Cir. 1989), the Seventh Circuit found that an inmate's Eighth Amendment claim should have survived summary judgment when the record demonstrated that "when he was initially placed in the segregation unit, the walls of his cell were smeared with human defecation, the water was not turned on and nothing was done for three days despite [the inmate's] requests . . . for cleaning supplies and water."

- In *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001), the Tenth Circuit found that an inmate's Eighth Amendment claim should have survived summary judgment when the record demonstrated that "the lack of access to working toilets led to [the inmate's] exposure to other inmates' urine and feces via the standing water and also to close confinement with the odor of his own accumulated urine" for thirty-six hours.

- In *Vinning-El v. Long*, 482 F.3d 923 (7th Cir. 2007), the Seventh Circuit found that an inmate's Eighth Amendment claim should have survived summary judgment when the record demonstrated that "[t]he floor of the cell was covered with water, the sink and toilet did not work, and the walls were smeared with blood and feces" and the inmate "was forced to remain in the cell without a

8

mattress, sheets, toilet paper, towels, shoes, soap, toothpaste, or any personal property, for six days."

- In *Wheeler v. Walker*, 303 F. App'x 365 (7th Cir. 2008), the Seventh Circuit found that an inmate stated a valid Eighth Amendment claim by alleging that "for two weeks prison guards, without explanation, ignored his requests for basic cleaning supplies while he was exposed to a combination of a heavy roach-infestation, filth, and human waste."

- In *Balistreri v. Kast*, 2017 WL 3299048 (W.D. Wis. Aug. 2, 2017), the district court found that a cell flooded by a malfunctioning toilet with urine and fecal matter for two and a half hours did not state a valid Eighth Amendment claim.

- In *Love v. Milwaukee Cnty. Jail Staff*, 2023 WL 4238870 (E.D. Wis. June 28, 2023) the district court found that a cell flooded with fecal matter for six hours did not violate the Eighth Amendment.

- In *Turner-Harris v. Johnson*, 2022 WL 1620350 (E.D. Wis. May 23, 2022), the district court found that the inmate's allegations that he spent fourteen hours overnight in a dirty cell that smelled of human waste and "slept on a mattress that had feces in the seams" raised a valid Eighth Amendment concern but described the decision as a "a close call."

Based on the court's survey of cases within the Seventh Circuit (and a Tenth Circuit opinion frequently cited with approval within the Seventh Circuit), it appears that the duration in which exposure to bodily waste arises to the level of an Eighth Amendment concern lay somewhere between six hours and thirty-six hours. *Turner-Harris* seems the most comparable case and suggests that the line might be drawn near fourteen hours. However, the court finds that *Turner-Harris* is distinguishable from this case. As a general proposition, the smell of human waste is more offensive than the smell of blood. Further, though the record suggests that Inmate Cox had smeared many of the surfaces within the cell with his blood, it does not suggest the presence of blood

9

on the bed. An unbloodied bed would have offered Rumler at least some reprieve from the risk of physical contact with the blood. Additionally, while Rumler was left in the bloody cell overnight,[5] the defendants named in this case did not allow him to remain in the bloody cell overnight once they learned of the unsanitary conditions. Construing the record in the light most favorable to Rumler, Rumler notified Sergeant Wells and Lieutenant Myers of the bloody cell conditions at 7:30 a.m., and he was removed eight hours later at 3:30 p.m.

  The record further demonstrates that, while Sergeant Wells and Lieutenant Myers might have acted more promptly, they did not completely disregard the risk of harm. According to Rumler, when Sergeant Wells discovered the bloody cell conditions, she said that she would convey this information to Lieutenant Myers, her immediate supervisor. She told another correctional officer that she could not address the conditions until she received a movement order. That correctional officer also confirmed that Lieutenant Myers was aware of the bloody conditions, suggesting that Sergeant Wells had followed through with speaking to him. When Rumler spoke with Lieutenant Myers, Lieutenant Myers represented that he was working to resolve the situation. And when Lieutenant Myers received the order to move Rumler, he moved Rumler. Though the defendants might have taken more drastic measures to curtail Rumler's exposure to another inmate's blood, the court cannot characterize the

---

[5] More specifically, he was placed in the cell from 2:00 a.m. and allowed to leave the cell at 3:30 p.m. Because it seems likely that Rumler's "night" began prior to 2:00 a.m., it is unclear whether his confinement to Cell 104 could be fairly characterized as occurring "overnight," but the court will assume so for purposes of this order.

10

defendants' actions as akin to "criminal recklessness" or "something approaching a total unconcern for a prisoner's welfare."

To recap, Rumler has not demonstrated that Sergeant Moore was aware that Rumler had been exposed to bloody cell conditions on the morning of August 20. He has not demonstrated that Sergeant Wells and Lieutenant Myers knew of the specific risk of contracting hepatitis C entailed by exposure to Inmate Cox's blood. And he has not demonstrated that the particular circumstances of his exposure to another inmate's blood known by the defendants rose to the level of an Eighth Amendment violation.

Next, the court considers the defendants' argument that they are entitled to qualified immunity. Generally, government officials are protected from civil liability when performing discretionary functions under the doctrine of qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001). Thus, in order to evaluate a claim of qualified immunity, the court engages in a two-step analysis. First, the court considers whether a plaintiff's claim states a violation of his constitutional rights. Then, the court determines whether those rights were clearly established at the time the violation occurred. *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000).

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir. 2010) (quoting

11

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The unlawfulness of a particular official's action must be apparent "in light of the pre-existing law." *Id.* A party may demonstrate that a right was clearly established by presenting a closely analogous case establishing the defendant's conduct was unconstitutional or by presenting evidence the defendant's conduct was so patently violative of a constitutional right that reasonable officials would know without guidance from a court. *See Hope*, 536 U.S. at 739–40.

      Here, the court reiterates that no evidence suggests that the defendants knew of the specific increased risk posed by Inmate Cox's blood; thus the qualified immunity inquiry focuses on whether the law was sufficiently developed to apprise the defendants that leaving Rumler in a bloody cell for eight hours amounted to a constitutional violation. Here, resolving the summary judgment arguments on Rumler's claim required the court to thoroughly canvass Seventh Circuit law for analogous cases, and the court reached its conclusion by meticulously distinguishing Rumler's case from a case that was itself a close call. Further, the court has identified no closely analogous case establishing that the defendants' conduct was unconstitutional and cannot find that the defendants' conduct was so patently violative of the Eighth Amendment that reasonable officials would know without guidance from any court. Consequently, the court cannot find that the unlawfulness of the defendants' contact was apparent from pre-existing law. The defendants are entitled to qualified immunity.

      In sum, the record demonstrates that the defendants did not violate Rumler's Eighth Amendment rights. Further, even assuming a violation of Rumler's Eighth

Amendment rights, the defendants are entitled to qualified immunity. Therefore, the defendants' motion for summary judgment is granted.

As a final matter, Rumler seeks physical copies of the medical records produced in discovery in this case because a flooded cell destroyed his copies. ECF 226. On December 11, 2023, the court printed and mailed more than five thousand pages of medical records to Rumler based on his prior request for copies due to another cell flood. ECF 217. At that time, Rumler's response to the motion for summary judgment was due, and the court reasonably assumed that he needed them to litigate this case. However, Rumler did not rely on his medical records in his summary judgment filings, and the court did not rely on them in resolving this case. Consequently, it is unclear why Rumler needs copies of his medical records at this stage of the proceedings. Given the voluminous nature of the copies and given that lack of any apparent need, the court denies the request for copies.

For these reasons, the court:

(1) GRANTS the motion for leave to file a sur-reply (ECF 227);

(2) DENIES the motion for copies (ECF 226);

(3) GRANTS the defendants' motion for summary judgment (ECF 213); and

(4) DIRECTS the clerk to enter judgment in favor of the defendants and to close this case.

SO ORDERED on February 23, 2024.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge